Michael Machat, Esq. SB#109475
MACHAT & ASSOCIATES, P.C.
8730 W. Sunset Blvd., Suite 250
West Hollywood, California 90069
Telephone: (310) 860-1833
Email:  info@machatlaw.com

Attorneys for Plaintiff
Vampire Family Brands, LLC

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

VAMPIRE FAMILY BRANDS, LLC,

            Plaintiff,

      vs.

APPLEBEES RESTAURANTS, LLC,
APPLEBEES SERVICES, INC., ,
DINE BRANDS GLOBAL, INC.,
STEPHEN P JOYCE, PATRICK
KIRK, JOHN CYWINSKI, FLYNN
RESTAURANT GROUP, GREG
FLYNN, APPLE AMERICAN,  RMH
FRANCHISE CORP, DOHERTY
ENTERPRISES, APPLE GOLD,
WISCONSIN HOSPITALITY
GROUP, SSCP MANAGEMENT, ,
and DOES 1 – 20,

         Defendants.

CASE NO 2:19-cv-09222-DOC (ADSx)

PLAINTIFF VAMPIRE FAMILY
BRANDS REPLY TO DEFENDANT
APPLEBEE'S SERVICES, INC.'S
COUNTERCLAIM

DEMAND FOR JURY TRIAL

### FIRST COUNTERCLAIM
**Declaratory Judgment of Invalidity and Non-Infringement
and Order for Cancellation of Reg. No. 5444375**

1.      Defendant Applebee's Services, Inc. brings this counterclaim for a Declaratory Judgment that (a) Plaintiff and/or any and all of its predecessors in interest (hereafter, "Plaintiff") has no protectable rights in the VAMPIRE mark in connection with the goods covered by US trademark Reg. No. 5444375 (the "Registration") and (b) Defendants therefore have not and could not have infringed Plaintiff's purported rights, and an Order that the Registration be cancelled in due course by the United States Patent and Trademark Office.

**ANSWER:** Plaintiff admits that Defendant Applebee's Services, Inc. has brought a counterclaim but Plaintiff denies each of the conclusions and allegations in the rest of this paragraph no 1.

### I.      JURISDICTION AND VENUE

2.      This counterclaim arises under the Lanham Act, particularly 15 USC § 1127. Jurisdiction is conferred on this Court by 15 USC § 1121(a), and by 28 USC § 1338(a), in that this case arises under the trademark laws of the United States. Venue is proper in this District under 28 U.S.C. §§ 1391(a) and (b) because Plaintiff/Counter-Defendant resides in this District.

**ANSWER:** Plaintiff admits the jurisdictional and venue allegations and denies any implications regarding the validity or invalidity of counterclaimant's claims that may follow.

### II.      THE PARTIES

3.      Defendant/Counterclaimant Applebee's Services, Inc. is a Kansas corporation headquartered in Glendale, California.

**ANSWER:** Plaintiff is without information or knowledge sufficient to

admit or deny the allegations of this paragraph, and therefore denies the same.

4.      On information and belief, Plaintiff/Counter-Defendant Vampire Family Brands, LLC is a Delaware limited liability company with its main business office located in Los Angeles County, California.

**ANSWER:** Admitted.

### III.   <u>MATERIAL FACTS</u>

5.      On information and belief, Counter-Defendant does not currently offer or market pre-mixed or prepared alcoholic beverages in connection with the VAMPIRE mark, and indeed has never sold such beverages in connection with the mark.

**ANSWER:** Plaintiff admits that it currently does not have sellable inventory of its Vampire Gourmet Bloody Mary.  Except as admitted, Plaintiff denies each and every allegation of this paragraph, including that it has never sold such beverages in connection with the VAMPIRE mark.

6.      On information and belief, Counter-Defendant's use of the VAMPIRE mark in connection with the goods covered by the Registration, if any, was limited to a small number of shipments of test products and a handful of sample tastings, all of which occurred in or around 2016 - 2018.

**ANSWER:**  Denied

7.      On information and belief, these shipments consisted of test cans that had been relabeled to reflect Counter-Defendant's branding, having originally been produced and branded by Counter-Defendant's former supplier under a different mark.

**ANSWER:**  Plaintiff Admits that it has shipped goods covered by the Registration in interstate commerce with the mark VAMPIRE thereon, including rebranded product.  Except as admitted, Plaintiff denies each and every allegation of Paragraph 7.

8.     On information and belief, the cans contained a bloody mary cocktail produced according to a recipe developed by the former supplier and originally intended for sale under the former supplier's mark.

**ANSWER:**  Plaintiff admits that its predecessor in interest acquired the rights to a Bloody Mary cocktail recipe developed by a former recipe.  Except as admitted, each and every allegation of Paragraph 8 is denied.

9.     On information and belief, the cans were intended for distribution in Europe and were 330 ml size, whereas in the US 355 ml (12 ounces) cans are used. This created a 25 ml disparity between the amount of liquid in the can and the amount stated on the label.

**ANSWER:**  Denied.

10.     On information and belief, a first shipment consisted of 20 cases of 24 cans (480 cans total) rewrapped by hand with Counter-Defendant's label.

**ANSWER:**  Denied.

11.     On information and belief, a second shipment consisted of 50 cases of 24 cans (1,200 cans total) rewrapped by hand with Counter-Defendant's label.

**ANSWER:**  Denied.

12.     On information and belief, these shipments occurred between May 2016 and January 13, 2017.

**ANSWER:**  Plaintiff admits that it made shipments of VAMPIRE branded Bloody Mary cocktail drinks in interstate commerce at least as early as September 2017.  Except as admitted, Plaintiff denies each and every allegation of paragraph 12.

13.     On information and belief, the 1,680 cans from these shipments were used to conduct free sample tastings.

**ANSWER:** Plaintiff admits that Plainitff's predecessor in interest provided VAMPIRE branded Bloody Mary cocktail drinks for sample tastings. Except as admitted, Plaintiff denies each and every allegation of paragraph 13.

14. On information and belief, a third shipment consisted of 911 cases of 24 cans (21,864 cans total).

**ANSWER:** Plaintiff admits that 911 cases of 24 cans (21,864 cans total) were shipped from Kentucky to Oakland, California. Except as Admitted, Plaintiff denies each and every allegation of Paragraph 14.

15. On information and belief, the cans in the third shipment had been wrapped with Plaintiff's label by machine.

**ANSWER:** Plaintiff admits that the 21,864 cans shipped from Kentucky to Oakland, California were labeled with Plaintiff's label by machine. Except as admitted, Plaintiff denies each and every allegation of Paragraph 15.

16. On information and belief, Counter-Defendant was dissatisfied with the appearance of the cans in the third shipment, and particularly with the fact that traces of the original branding were still visible.

**ANSWER:** Plaintiff admits that there was a shipment for which Plaintiff was dissatisfied with the appearance of the cans. Except as admitted, Plaintiff denies each and every allegation of Paragraph 16.

17. On information and belief, Counter-Defendant was also dissatisfied with the taste of the product, which Counter-Defendant believed had deteriorated as a result of the laser process used to relabel the cans by machine.

**ANSWER:** Plaintiff admits that there was a shipment of approximately 1000 cases of 24 x 355 cans in which Plaintiff was dissatisfied with taste. Except as admitted, Plaintiff denies each and every allegation of Paragraph 17.

18.     On information and belief, Counter-Defendant believed that the laser process cooked the contents of the cans, so the product delivered didn't have the same taste as the first hand-wrapped batch.

**ANSWER:** Admitted that at one time Plaintiff believed that a laser labeling process cooked the contents of the cans and that the delivered product did not have the same taste as previously approved product.  Except as admitted, Plaintiff denies each and every allegation of Paragraph 18.

19.     On information and belief, Counter-Defendant had shipped approximately 240 cases of bad tasting product to distributors before discovering the problem.

**ANSWER:** Plaintiff admits that it had shipped approximately 240 cases of product that did not meet Plaintiff's high-standards before recognizing that the delivered product did not have the same taste as previously approved product.  Except as admitted, Plaintiff denies each and every allegation of Paragraph 19.

20.     On information and belief, Counter-Defendant believed it lost good will and time due to the poor production practices, which resulted in an improper taste.

**ANSWER:** Admitted.

21. On information and belief, Counter-Defendant believed it may be impossible to recover its reputation with the affected distributors.

**ANSWER:** Denied.  Plaintiff has been in contact with these distributors, each of which buy Plaintiff's wine, and Plaintiff believes it will get another

opportunity to sell its Vampire Gourmet Bloody Mary to the affected distributors.

22.     On information and belief, in light of the low quality nature of the product and packaging, Counter-Defendant opted not to order additional shipments or to bring the product to market through the intended distribution channels. Instead, Counter-Defendant hoped to liquidate its small inventory through a discount retailer.

**ANSWER:** Denied.  Plaintiff, via its predecessor, opted not to sell the particular product as it did not meet Plaintiff's taste and labeling standards. Plaintiff contemplated liquidating that particular inventory through a discount retailer but was concerned of the effect it may have on Plaintiff's brand. Plaintiff decided not to buy product from that same supplier, but Plaintiff has never discontinued the product.

23.     On information and belief, a Certificate of Label Approval from the Alcohol and Tobacco Tax and Trade Bureau is required to lawfully bottle and distribute labeled beverage alcohol products in the United States.

**ANSWER:** Admitted.

24.     On information and belief, Counter-Defendant never had permission from the Alcohol and Tobacco Tax and Trade Bureau to relabel the cans with its branding.

**ANSWER:** Denied.    Plaintiff is in possession of certificate of label approvals and Plaintiff believes permission was granted to relabel the cans.

25.     On information and belief, in August 2018, the Alcohol and Tobacco Tax and Trade Bureau informed Counter-Defendant that the relabeled cans must be destroyed or surrendered for destruction.

**ANSWER:** Plaintiff admits that one person who worked for the Alcohol Tobacco Tax and Trade Bureau ("TTB") was of the opinion that the approximately 1000 cases of relabeled cans were required to be destroyed. Except as admitted, Plaintiff denies each and every allegation of Paragraph 25. Plaintiff further affirmatively asserts that other officers for the TTB had pre-approved the relabeling.  Plaintiff's predecessor did not challenge the officer's finding that the relabeled cans were required to be destroyed because Plaintiff's predecessor in interest did not want to sell the product in view of the fact that it did not meet the predecessor's standards.

26.    On information and belief, Counter-Defendant surrendered its remaining inventory of relabeled cans for destruction, and therefore, none of the inventory was ever offered for sale or sold to retailers or consumers.

**ANSWER:** Plaintiff admits that none of the remaining inventory of relabeled cans was ever offered for sale or sold to retailers or consumers after Plaintiff's predecessor in interest agreed not to.  Except as admitted, Plaintiff denies each and every allegation of Paragraph 26.

27.    On information and belief, since destroying its inventory, Counter-Defendant has not produced, caused to be produced, or otherwise acquired or owned any bloody mary or other cocktail product packaged under the VAMPIRE mark.

**ANSWER:** Denied.

28.    On information and belief, Counter-Defendant ceased all use of the VAMPIRE mark in connection with the goods covered by the Registration at least as early as August 2018, and likely earlier.

**ANSWER:** Denied.

## COUNT I

## <u>Declaratory Judgment of Invalidity of Reg. No. 5444375</u>

29.     Counterclaimant re-alleges and incorporates herein paragraphs 1 through 28 of this Counterclaim.

**ANSWER:** Counter-defendant re-asserts and incorporates herein paragraphs 1 through 28 of this Reply.

30.     Counter-Defendant's activities as set forth above do not constitute lawful use in commerce pursuant to 15 USC § 1127 because Counter-Defendant's products were at all times in violation of Alcohol and Tobacco Tax and Trade Bureau labeling requirements, and therefore failed to constitute legal use of the mark in commerce. Counter-Defendant's activities therefore could not give rise to trademark rights in the VAMPIRE mark in connection with the goods covered by the Registration.

**ANSWER:** Denied.

31.     In the alternative, Counter-Defendant's activities as set forth above, without more, did not constitute bona fide use of a mark in the ordinary course of trade pursuant to 15 USC § 1127, and therefore did not give rise to continuing rights in the VAMPIRE mark in connection with the goods covered by the Registration.

**ANSWER:** Denied.

32.     In the alternative, on information and belief, Counter-Defendant has ceased use of the VAMPIRE mark in commerce in connection with the goods covered by the Registration and does not intend to resume such use, but rather seeks to improperly maintain the registration solely for the purpose of reserving a right in the mark so as to prosecute this lawsuit (and potentially others). Counter-Defendant thereby abandoned the VAMPIRE mark in connection with the goods covered by the Registration.

**ANSWER:** Denied.

33.     The Registration is therefore void and unenforceable.

**ANSWER:** Denied.

## COUNT II

## Declaratory Judgment of Non-infringement

34.     Counterclaimant re-alleges and incorporates herein paragraphs 1 through 33 of this Counterclaim.

**ANSWER:** Counter-defendant re-asserts and incorporates herein paragraphs 1 through 33 of this Reply.

35.     Counter-Defendant does not have any protectable rights in the VAMPIRE mark in connection with the goods covered by the Registration, and therefore Defendants could not possibly have violated Plaintiff's rights.

**ANSWER:** Denied.

36.     Defendants have not infringed or otherwise violated any protectable right of Counter-Defendant.

**ANSWER:** Denied.

37.     In the alternative, any use of the term "vampire" by any of the Defendants constituted classic fair use.

**ANSWER:** Denied.

38.     On information and belief, vampiric creatures, which are said to subsist by feeding on the essence (usually in the form of blood) of the living, have been a part of folklore for millennia.

**ANSWER:** Plaintiff is without information or knowledge sufficient to admit or deny the allegations of this paragraph, and therefore denies the same.

39.     On information and belief, the first published appearance of the English word "vampyre" dates to 1734.

1

2

**ANSWER:**  Plaintiff is without information or knowledge sufficient to admit or deny the allegations of this paragraph, and therefore denies the same.

3

4

5

40. On information and belief, the current common depiction of a vampire figure – a pale, gaunt human figure with fangs that often wears a cloak or a cape – was popularized in the early 19th century.

6

7

**ANSWER:**  Plaintiff is without information or knowledge sufficient to admit or deny the allegations of this paragraph, and therefore denies the same.

8

9

10

11

12

13

14

15

16

41.On information and belief, vampires have been a tremendously popular subject for works of fiction, and indeed has spawned its own genre. The first successful vampire story was "The Vampyre," by the English writer John Polidori, published in 1819. Bram Stoker's novel "Dracula," published in 1897, remains the seminal work in the genre, and the Dracula character has been the basis for dozens of films, from "Nosferatu" in 1922 to "Bram Stoker's Dracula" in 1992. More recently, of course, the "Twilight" series of vampire-centered books has gained immense popularity worldwide, selling over 120 million copies. The "Twilight" books were adapted into a film series that has grossed over $3.3 billion worldwide.

17

18

19

**ANSWER:**  Plaintiff is without information or knowledge sufficient to admit or deny the allegations of this paragraph, and therefore denies the same.

20

21

22

42.           On information and belief, vampires are commonly associated with Halloween celebrations, for example, as a common decorative element, party theme, and/or costume choice for trick-or-treaters and partygoers.

23

24

25

26

**ANSWER:**  Denied.   Plaintiff affirmatively asserts that a vampire outfit is only one of many thousand popular Halloween costumes, but that is not to say that vampires equate with Halloween.  Vampires are year-round creatures and Halloween is not a factor in Vampire literature or in Vampire films.

27

28

43. On information and belief, "vampire" is also an exceedingly commonly used term to describe drinks with a "blood" red or purple color. A Google search on "vampire cocktail" returns more than 20 million results and includes recipes for a "Vampire Vodka Cocktail" (featured on Martha Stewart's website), a "Vampire's Kiss Martini" (featured on Food.com), a "Halloween Vampire Cocktail," a "Vampire Blood Cocktail," a "Vampire Inspired Cocktail," a "Vampire's Drip Cocktail," a "Bloody Vampire Cocktail," among countless others. *See* Exh. A

**ANSWER:**  Plaintiff is without information or knowledge sufficient to admit or deny the allegations of this paragraph, and therefore denies the same. Plaintiff further affirmatively denies that Exhibit A reflects any commercial use of a drink branded with mark VAMPIRE.

44.     On information and belief, vampire-themed promotions, including drink promotions, are common in the restaurant industry. Among numerous examples, GloriaFood.com advises that restaurants could "use plenty of Halloween restaurant promotions to attract customers, like: *2-for-1 Vampire punches*" (linking to recipe for "The Vampire Punch"; emphasis in original) and "vampire blood" shots in laboratory tubes or syringes. *See* Exh. B. POS Sector, a vendor of restaurant management software, notes that "Any food or drink with red colors could be used. It is almost mandatory to have red tomato soup on your menu that you can named for Halloween as a 'vampire blood.'" *Id.* The Lightspeed restaurant blog advises that restaurants "can run a special menu through the rest of October, or just for the Halloween weekend with pricing per item. Don't forget cocktails as well … grenadine can be used to simulate the look of blood for layered drinks or shots, and cranberry juice can add a crimson tone to vampire-themed drinks." *Id.*

**ANSWER:**  Denied.

45. Participating Applebee's restaurants frequently offer special drink promotions that are seasonal and/or tied to particular holidays.

**ANSWER:**  Plaintiff is without information or knowledge sufficient to admit or deny the allegations of this paragraph, and therefore denies the same.

46.   On or around October 1-31, 2019, participating Applebee's restaurants engaged in a Halloween-themed promotion that involved, among other elements, a "vampire" cocktail. The cocktail was made with a mix of rum and various tropical fruit juices and was purple in color. The cocktail was garnished with a cherry and a set of plastic vampire fangs.

**ANSWER:**  Admitted that defendants sold drinks branded as a VAMPIRE cocktail garnished with a set of plastic fangs.  Plaintiff is without information or knowledge sufficient to admit or deny the remaining allegations of this paragraph, and therefore denies the same.

47.  The Applebee's Halloween promotion used the term "vampire" to describe the color of its cocktail, the garnish of plastic fangs, and the cocktail's connection to the seasonal promotion.

**ANSWER:** Denied.   Defendants used the term "vampire" as a trademark, in complete disregard and in bad faith to Plaintiff's pre-existing trademark rights in the term vampire, in order to lure customers into its restaurants as a loss leader.

48.   Accordingly, use of the term "vampire" by any and all of the Defendants was descriptive and not as a trademark.

**ANSWER:** Denied.

49.    Such use by any and all of the Defendants was in good faith.

**ANSWER:** Denied.

50.    Use by any and all of the Defendants of the term "vampire" therefore constituted classic fair use and cannot give rise to liability for any of

Plaintiff's claims.

    **ANSWER:** Denied.

## **JURY DEMAND**

    Defendant/Counterclaimant demands a trial by jury on all issues so triable.

    **RESPONSE:**

    Plaintiff/Counterclaimant likewise demands a trial by jury on all issues so triable.

## **REQUEST FOR RELIEF**

    WHEREFORE, Defendant/Counterclaimant Applebee's Services, Inc. prays for judgment as follows:

    **RESPONSE:**

    Counterclaimant is not entitled to any relief whatsoever and should pay instead the amount demanded of it by Plaintiff in its complaint and determined by a jury.

Respectfully submitted,

                            MACHAT & ASSOCIATES, P.C.

Dated:  April 2 , 2020     By:   *Michael Machat*
                                    Michael Machat, Esq.
                                    Attorneys for Plaintiff
                                    Vampire Family Brands, LLC